Lydia SANTIAGO, as personal representative of the
Estate of Jaime Santiago, Plaintiff-Respondent, †

v.

Kathleen WARE, Wayne Mixdorf, Todd Zangl and
Dennis Danner, Defendants-Appellants.

Court of Appeals

*No. 95–0079. Submitted on briefs July 10, 1996.—Decided
September 30, 1996.*

(Also reported in 556 N.W.2d 356.)

†Petition to review denied.

300

301

For the defendants-appellants the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Stephen J. Nicks*, assistant attorney general.

For the plaintiff-respondent the cause was submitted on the brief of *Lawrence Bensky and Melanie Cohen* of *Lafollette & Sinykin* of Madison.

Before Dykman, P.J., and Paul C. Gartzke and Robert D. Sundby, Reserve Judges.

GARTZKE, Reserve Judge. Kathleen Ware, Todd Zangl and Dennis Danner appeal from a judgment awarding damages to Jaime Santiago, an inmate at Waupun Correctional Institution (WCI). The defendants are state prison employees whose duties include the disciplining of inmates. The underlying

action is for damages under 42 U.S.C. § 1983 and damages under state law for negligence.

The § 1983 issues are whether: (1) Santiago had a liberty interest in not having his mandatory release date extended and in remaining in a community residential confinement program; (2) Santiago waived procedural due process objections by not raising them at his disciplinary hearing and on administrative appeal; (3) the evidence presented at Santiago's disciplinary hearing satisfies due process requirements; (4) the defendants' acts were random and unauthorized and did not deprive Santiago of due process because he had adequate state remedies; and (5) the defendants enjoy qualified immunity from this suit. The issue on the state law negligence claims against Ware, Zangl and Danner is whether the defendants enjoy discretionary immunity.

We conclude Santiago had a liberty interest in not having his mandatory release date extended, but not in remaining in a community-residential confinement program. We conclude that Santiago waived all procedural due process objections, except for one: that the evidence presented at his hearing did not satisfy due process requirements. Because that objection is one of procedural rather than substantive due process, we conclude defendants prevail under the random and unauthorized conduct defense. Because of our disposition, we do not reach the issue of qualified immunity.[1] We also conclude defendants Ware, Zangl

---

[1] Qualified immunity is immunity from suit. *Santiago v. Leik*, 179 Wis. 2d 786, 790-91, 508 N.W.2d 456, 458 (Ct. App. 1993). Its purpose is to spare a public official not only from unwarranted liability but from the "unwarranted demands customarily imposed upon those defending" a long, drawn-out lawsuit. *Id.* at 791, 508 N.W.2d at 458 (quoting *Siegert v. Gilley*,

and Danner enjoy discretionary immunity from Santiago's state law negligence claim. We reverse.

## I.

## BACKGROUND[2]

Jaime Santiago was a thirty-seven-year-old inmate in the Wisconsin correctional system who resided at Plymouth Manor Nursing Home in Milwaukee under care for progressive amyotrophic lateral sclerosis (ALS), also known as Lou Gehrig's disease.[3] He had been transferred from Columbia Correctional Institution to the Community Residential Confinement (CRC) program on January 8, 1992, the same date on which he entered Plymouth Manor.[4]

By June 1992, Santiago's ALS had progressed to the point where he could not use his hands or stand without assistance. He had little or no use of most of his

---

500 U.S. 226, 232 (1991)). Although we would normally address the qualified immunity issue first, we have instead followed the order of issues presented in the State's supplemental brief on the effect of *Sandin v. Conner*, — U.S. —, 115 S. Ct. 2293 (1995), on this appeal and in its initial brief to this court.

[2] Unless otherwise indicated, we draw our facts from the trial court's findings of fact and the undisputed facts of record.

[3] He died on November 20, 1995, while this appeal was pending. His sister, Lydia Santiago, has been substituted for him.

[4] Section 301.046(1), STATS., requires the Department of Corrections (DOC) to establish and operate the CRC program in order to "confine prisoners in their places of residence or other places designated by the department." DOC determines prisoner eligibility for the program, § 301.046(3), and must monitor a prisoner in confinement under the program by the use of an electronic device "worn continuously on the prisoner's person." Section 301.046(5).

muscles. He had to be fed, bathed and cared for by others. By July 1992, his speech was badly impaired, making it difficult for others to understand him.

On June 18, 1992, Santiago had an argument with a cook at Plymouth Manor. The next day, the director of Plymouth Manor met with Jon Schubert, Santiago's probation and parole agent, and Schubert's supervisor, defendant Kathleen Ware. At the end of the meeting, the director decided Santiago would no longer reside at Plymouth Manor.

On June 20, 1992, Santiago was transferred to W CI, where he resided at the Health Services Unit. He remained in temporary lockup status pending investigation of the incident at Plymouth Manor.

On June 29, 1992, Schubert prepared a conduct report on the incident. He did not interview Santiago or the cook about their argument.[5] He did not personally

---

[5] In the prison system a conduct report operates as the equivalent of a police report and criminal complaint. WISCONSIN ADM. CODE § DOC 303.66(1) requires in relevant part: "[A]ny staff member who observes or finds out about a rule violation shall do any investigation necessary to assure himself or herself that a violation occurred, and if he or she believes a violation has occurred, shall write a conduct report." In the conduct report, the staff member must "describe the facts in detail and what other staff members told him or her, and list all sections [of the disciplinary rules contained in WIS. ADM. CODE ch. DOC 303] which were allegedly violated. . . ." WIS. ADM. CODE § DOC 303.66(2).

The security director at the institution where the inmate resides must review the conduct report to determine if the facts alleged could support a finding of guilt for the alleged specified violations of the DOC code. WIS. ADM. CODE § DOC 303.67(1) and (3). After the security director's review, the conduct report is served upon the inmate. See WIS. ADM. CODE §§ DOC 303.75(1) and 303.76(1).

determine the nursing home rules Santiago had violated. He relied on another correctional officer's recommendation for the charges he made against Santiago. The conduct report alleged that Santiago violated WIS. ADM. CODE §§ DOC 303.16 (threats), 303.28 (disruptive conduct), and 303.63 (violation of institution policies and procedures). The report did not specify the pertinent institution policies or procedures.

Serving as acting security director, Ware reviewed the conduct report. She incorrectly classified the offenses as major under WIS. ADM. CODE § DOC 303.68(3) without looking at that provision. WISCONSIN ADM. CODE § DOC 303.68(3) lists certain DOC rule violations as automatic major offenses. None of Santiago's charged violations fell into this category.[6]

On July 1, 1992, Sergeant Alvin Krueger served Santiago with the conduct report and with the Notice of Major Disciplinary Hearing Rights Form. That form contains a section entitled "Waiver of Formal Due Process (Major) Hearing," to be completed by the inmate. When Krueger helped Santiago fill out the form, Krueger mistakenly marked a box in the middle of the form to indicate Santiago waived his right to a formal due process hearing. Santiago pointed out the mistake, and Krueger scratched it out. Krueger did not

---

[6] A major offense is a violation of a disciplinary rule for which a major penalty may be imposed. WIS. ADM. CODE § DOC 303.68(1)(c). A major penalty may include imposition of adjustment or program segregation, loss of earned good time or extension of a mandatory release date. WIS. ADM. CODE § DOC 303.68(1)(a). All other offenses are classified as minor. A minor penalty may consist of reprimand, loss of recreation privileges, building or room confinement, loss of a specific privilege, extra duty or restitution. WIS. ADM. CODE § DOC 303.68(1)(b) and (1)(d).

check a second box, located at the bottom of the form, that also would indicate waiver of a formal due process hearing.

On July 20, 1992, defendant Todd Zangl, a Division of Intensive Sanctions supervisor, held a hearing at WCI on the conduct report. Santiago had not been told that Zangl was coming to hold the hearing, and he had not been contacted by an advocate or prepared a defense. He had not been told which policy or procedure he was charged with violating under WIS. ADM. CODE § DOC 303.63.

Zangl conducted the hearing as a "waiver hearing" rather than a due process hearing.[7] Zangl did not carefully review Santiago's Waiver of Major Hearing Form, despite his responsibility to do so, and he missed the cross-out in the waiver box. No rule or regulation requires a hearing officer before holding a waiver hearing to speak with the inmate to verify that he has waived his due process rights. Because Zangl could not understand Santiago, he asked Holly Meier, a nurse at WCI, to translate. With her help, Santiago told Zangl he wanted a due process hearing, but Zangl continued with the waiver hearing.

At the conclusion of the hearing, Zangl found Santiago guilty of violating WIS. ADM. CODE §§ DOC 303.28 (disruptive conduct) and 303.63 (violation of

---

[7] Both types of hearings are used to determine an inmate's guilt or innocence of the charges contained in a conduct report. Inmates accused of major violations may waive the right to a due process hearing in writing at any time. WIS. ADM. CODE § DOC 303.76(2). The inmate who waives a due process hearing has a hearing (a waiver hearing) using the same procedures as for minor violations. *Id.* The inmate does not have a staff advocate and may not confront witnesses or have witnesses testify on his or her behalf. WIS. ADM. CODE § DOC 303.75(4).

institution policies and procedures) and not guilty of violating WIS. ADM. CODE § DOC 303.16 (threats). Zangl imposed a ten-day extension of Santiago's mandatory release date and referred him to the program review committee (PRC).[8] On July 21, 1992, the PRC terminated Santiago from CRC. The trial court found that as a result of referral to PRC, Santiago remained at WCI, in the hospital, until June 30, 1993.[9]

Santiago appealed Zangl's determination to Dennis Danner, a Division of Intensive Sanctions supervisor. Santiago cited as ground for his appeal only

---

[8] A PRC approves all inmate placements in CRC. WIS. ADM. CODE § DOC 327.06(6). Inmates in CRC must abide by the procedures and rules of any facility in which they are housed. WIS. ADM. CODE § DOC 327.09(1)(d). If, after a due process hearing, the department determines the inmate has violated the rules of the facility in which the inmate is held or to which the inmate is assigned, the case is referred to the PRC for review and possible termination of CRC status. WIS. ADM. CODE §§ DOC 327.10(3), 327.11(3)-(6) and 327.13. For purposes of termination, the PRC consists of three members—a social worker, a correctional officer and a member of the department supervisory staff. WIS. ADM. CODE § DOC 327.11(1). The department may temporarily remove the inmate from CRC status pending the outcome of a disciplinary due process hearing or PRC review. WIS. ADM. CODE § DOC 327.11(4). The due process hearing must generally be conducted in accordance with WIS. ADM. CODE §§ DOC 303.64 to 303.87. WIS. ADM. CODE § DOC 327.13. The parties have not addressed whether a waiver hearing may be used to terminate a CRC assignment.

[9] On June 30, 1993, Santiago was transferred back to CRC and admitted to a nursing home in Janesville. On October 11, 1993, he was transferred to the Marion Catholic Home in Milwaukee where, on July 27, 1994, he was charged with making threats and transferred back to Waupun, where he remained throughout the trial.

that he was not guilty and Zangl had not considered his account of what happened. On September 1, 1992, Danner affirmed Zangl's decision. Danner found that Zangl considered Santiago's account of what happened before rendering his decision and that "Santiago's behavior [at Plymouth Manor] created a risk of serious disruption and risk of injury to another person."

On September 9, 1992, Santiago filed his complaint in circuit court. While that action was pending, Danner ordered a rehearing on Santiago's conduct report. Santiago received a due process hearing on February 8, 1993, before a new examiner, Daniel Benzer. Santiago had an advocate. Schubert was the only witness. Examiner Benzer found Santiago not guilty of violating WIS. ADM. CODE § DOC 303.63 (violation of institution policies and procedures) and guilty of violating WIS. ADM. CODE § DOC 303.28 (disruptive conduct). He imposed a ten-day extension of Santiago's mandatory release date, without a referral to the PRC.

## II.

## TRIAL COURT DECISIONS

Santiago's complaint alleged defendants had: (1) violated his right to due process under the Fourteenth Amendment of the United States Constitution and (2) negligently performed ministerial duties.[10] He requested compensatory and punitive damages for each day he spent out of the CRC program and for

------

[10] The complaint also sought damages for defendants having deprived him of his right to a remedy guaranteed by art. I, § 9 of the Wisconsin Constitution. We deem Santiago to have abandoned this claim by his failure to offer argument or evidence to support it.

311

violation of his rights, and "[a]ll other and further relief deemed appropriate."

## A. Pretrial Decisions

The parties filed numerous motions for summary judgment and reconsideration. We summarize the trial court's four written opinions on the motions.

### 1. Section 1983 Claim

The court ruled that Santiago's procedural due process rights were violated at the first conduct report hearing because he did not have a staff advocate or an adequate opportunity to prepare a defense. Santiago did not waive his § 1983 claims by failing to raise the waiver hearing issue in his administrative appeal before Danner. Santiago had been denied substantive due process because insufficient evidence existed on which to find him guilty. The rehearing in February 1993 was "an incomplete cure" for the constitutional deprivations Santiago sustained in the first hearing.

The court held Santiago's intent not to waive a full due process hearing was undisputed but that a factual dispute existed whether his attempt to communicate that intent to Zangl was effective.

The court held that Zangl was not entitled to qualified immunity from suit on Santiago's claim that Zangl had violated his procedural and substantive due process rights. The court ruled that Zangl unreasonably held the hearing if he knew Santiago had not waived his due process rights. If the fact-finder found at trial that Santiago had effectively protested the waiver of his full due process rights, Zangl was not entitled to qualified immunity from suit on Santiago's procedural due process claim. Zangl had no qualified

immunity regarding Santiago's claim that Zangl had violated his substantive due process right since the requirement that a prison official have "some evidence" to support a finding of guilt had been clearly established prior to Santiago's hearing before Zangl.

The court held that Danner was not qualifiedly immune from Santiago's procedural and substantive due process claims. The court ruled that Danner had a duty to review the documents presented at the conduct report hearing, including the waiver forms. The court ruled that Danner's "affirming Zangl's failure to provide plaintiff with a full due process hearing, absent an effective waiver, was objectively unreasonable." Danner's affirming "Zangl's finding of guilt without some evidence was also objectively unreasonable." Consequently, Danner was not entitled to qualified immunity.

The court held that Zangl could not invoke the "random and unauthorized conduct" defense because Zangl's conduct was not "unauthorized" and because the state failed to provide an adequate postdeprivation remedy in the administrative appeal.

The court's pretrial decisions do not rule on Santiago's § 1983 claim against Ware.

2. State Claim for Common Law Negligence

The court ruled that because his duties were ministerial, Zangl was not entitled to discretionary immunity. On Santiago's state law claim for negligence, Danner was not entitled to discretionary immunity because he had a ministerial duty to determine whether Santiago had checked the waiver box. Danner was, however, entitled to discretionary immunity regarding his evaluation of the hearing record to determine whether sufficient evidence

existed to find Santiago guilty. Ware was entitled to immunity because the act of selecting offenses involves discretion.

B. Trial Court's Findings of Fact and Conclusions of Law

After a three-day bench trial, the court found that as a direct result of Zangl's findings of guilt and referral of plaintiff to the PRC, Santiago's security classification was changed from minimum to maximum, his CRC status was terminated, and he was held at WCI until June 30, 1993. The court found that had the PRC conducted its own review without both major rule violations on Santiago's record instead of relying on Zangl's hearing, it was unlikely that the PR C would have changed his security classification, and he would have been placed in another nursing home. Santiago suffered depression by being placed at WCI Health Services Unit (HSU) and attempted suicide. The court described HSU as "Dickensian in its vintage and bleakness."

The court concluded that Zangl had violated Santiago's right to due process because he recklessly disregarded Santiago's desire for an advocate and for a due process hearing. Zangl further recklessly disregarded Santiago's rights because: (1) he failed to determine under WIS. ADM. CODE § DOC 303.63 both the lack of notice of charge and "the requirements of that section" and (2) he found Santiago guilty of disruptive behavior on non-attributed evidence by drawing improper inferences from Santiago's statement and by failing to list in his written decision the portions of Santiago's statement supporting his determination of guilt.

The court concluded that Danner had violated Santiago's right to due process because he recklessly disregarded his duties to independently evaluate the waiver form, the WIS. ADM. CODE § DOC 303.63 charge, the designation of the violations as major under WIS. ADM. CODE § DOC 303.68(3), the lack of attribution to "facts" contained in the conduct report, and the contents of plaintiff's statement to defendant Zangl.

The court determined that Zangl's and Danner's actions constituted an "abuse of power" and that they had recklessly breached their state law duties to provide Santiago with due process protections. The court concluded that Ware had negligently and recklessly violated Santiago's "due process right to have his alleged offenses properly charged and classified."

The trial court awarded Santiago $500 damages for Zangl's violations of his due process rights alone without reference to the further damages he suffered as a result of the PRC review. The court awarded Santiago $10,000 damages against Ware, Zangl and Danner for the injuries caused by defendants' violations of his due process rights and Santiago's attorney fees and costs. Because defendants seemed to have been inadequately trained and the court inferred they bore no malice, the court did not award punitive damages. The court declared that Zangl and Danner had deprived Santiago of due process by denying him a due process hearing and by finding him guilty without some reliable evidence of guilt. It ordered expungement of the ten-day extension of Santiago's mandatory release date.

III.

SANTIAGO'S § 1983 CLAIMS

A. Liberty Interest

Santiago grounds his § 1983 claim on his contention that he was deprived of liberty interests without due process of law. He argues he has liberty interests in not having his mandatory release date extended and in maintaining his CRC status. We agree he has a liberty interest in not having his mandatory release date extended. We hold he has no liberty interest in maintaining his CRC status.

Certain liberty interests inherent in the Due Process Clause—such as the conditional freedom held by parolees and probationers—and are not subject to deprivation without adherence to strict procedural safeguards. *Harper v. Young*, 64 F.3d 563, 564 (10th Cir. 1995), *cert. granted*, 116 S. Ct. 1846 (1996) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1971), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)). More commonly, an inmate's liberty interests are created by state law. *Harper*, 64 F.3d at 564. In *Sandin v. Conner*, — U.S. —, 115 S. Ct. 2293 (1995), the Supreme Court held that while states may create liberty interests protected by the Due Process Clause, those

> interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin,* — U.S. at —, 115 S. Ct. at 2300 (citations omitted). For that reason, courts need no longer engage in "the search for a negative implication from mandatory language in prison regulations" previously required by *Hewitt v. Helms,* 459 U.S. 460 (1983), and *Kentucky Dep't. of Corrections,* 490 U.S. 454 (1989). *Sandin,* — U.S. at —, 115 S. Ct. at 2300.

The *Sandin* court held that a prisoner had no liberty interest in remaining free from segregated confinement. However, it distinguished segregated confinement as a discipline from cases "where the State's action will inevitably affect the duration of his sentence." *Sandin,* — U.S. at —, 115 S. Ct. at 2302. An inmate's interest in his mandatory release date is like his interest in good-time credits. A liberty interest in good-time credits is one of "real substance and is sufficiently embraced within Fourteenth Amendment 'liberty.' " *Wolff v. McDonnell,* 418 U.S. 539, 557 (1974). In Wisconsin, a state inmate is entitled to mandatory release on parole when he has completed two-thirds of his sentence, unless violations of regulations have extended his mandatory release date.[11] We conclude that under *Sandin,* Santiago retains a liberty interest in not having his mandatory release date extended.[12]

---

[11] Section 302.11, STATS., provides in relevant part:

(1) [E]ach inmate is entitled to mandatory release on parole by the department. The mandatory release date is established at two-thirds of the sentence. . . .

(2)(a) Any inmate who violates any regulation of the prison or refuses or neglects to perform required or assigned duties is subject to extension of the mandatory release date as follows: 10 days for the first offense, 20 days for the 2nd offense and 40 days for the 3rd or each subsequent offense.

[12] Other courts agree. *See McGuinness v. Dubois,* 75 F.3d 794, 797 n.3 (1st Cir. 1996); *Gotcher v. Wood,* 66 F.3d 1097, 1100

■ We turn to Santiago's loss of his CRC assignment and his return to WCI. Neither event imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, — U.S. at —, 115 S. Ct. at 2300. His transfer to WCI subjected him to conditions no different from those ordinarily experienced by large numbers of other inmates. *See Dominque v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996) (holding that under *Sandin*, inmate did not have state-created liberty interest in work release program);[13] but *see Roucchio v. Coughlin*, 923 F. Supp. 360, 374 (E.D.N.Y., 1996). While WCI may be

_____

(9th Cir. 1995); *Nelson v. McBride*, 912 F. Supp. 403, 406 (N.D. Ind. 1996); *Priest v. Gudmanson*, 902 F. Supp. 844, 846 (E.D. Wis. 1995).

[13] The first circuit's reasoning is persuasive. Were Santiago's argument to prevail:

> [W]e would open the door to finding an "atypical . . . restraint" whenever an inmate is moved from one situation to a significantly harsher one that is, nonetheless, a common-place aspect of prison existence. For example, a liberty interest could be claimed if an inmate were moved into less agreeable surroundings than his initial placement. Similarly, a liberty interest might be claimed whenever authorities or the state legislature decided to eliminate or cut back work release programs or furloughs. Such changes, painful to those affected, could be regarded under plaintiff's argument as implicating liberty interests even though the prisoner was never placed in conditions going beyond the customary rigors of prison life. Such an outcome, we believe, would directly conflict with *Sandin*'s teachings. *Sandin*'s new standard was expressly adopted by a majority of the Supreme Court "to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." [*Sandin*], 115 S. Ct. at 2299. The Court plainly intended to eliminate the basis for federal due process claims stemming from internal transfers and status changes that do not result in "atypical hardship," *i.e.*, hardship beyond the norms of ordinary prison life.

"Dickensian in its vintage and bleakness," that can hardly be said to be at variance with the ordinary incidents of prison life. Indeed, it *is* life at WCI.

Nor, as Santiago argues, is a liberty interest created by the requirement in WIS. ADM. CODE § DOC 327.11(3) that an inmate have a "due process hearing" before his CRC status is terminated. This is the type of "search for a negative implication from mandatory language" which courts need no longer make. *Kirsch v. Endicott*, 201 Wis. 2d 702, 712, 549 N.W.2d 761, 765 ( Ct. App. 1996) (citing *Sandin*, — U.S. at —, 115 S. Ct. at 2300).

Santiago cites *Harper*, 64 F.3d at 566-67, and *Edwards v. Lockhart*, 908 F.2d 299 (8th Cir. 1990), for the proposition that his CRC assignment was more like that of a parolee than an inmate, and therefore he possessed a. liberty interest in CRC assignment. The *Harper* court reviewed Oklahoma's Pre-parole Conditional Supervision program, in which participants remained in "constructive custody" of the department of corrections but worked and resided beyond the confines of a state penal institution.

> The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate. It is the freedom to "be gainfully employed," "to be with family and friends," and "to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482, 92 S. Ct. at 2601. It is the ability to reside in a home of one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens. The passage

*Dominque v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996), *but see Roucchio v. Coughlin*, 923 F. Supp. 360, 374 (E.D.N.Y., 1996).

outside the walls of prison does not simply alter the degree of confinement; rather, it works a fundamental change in the *kind* of confinement, a transformation that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections outlined in *Morrissey. See, e.g., id.* at 481-84, 92 S. Ct. at 2600-02.

*Harper*, 64 F.3d at 566.

The *Edwards* court viewed parole and work release under an Arkansas program as a continuum, with more freedom and self-determination associated with parole and less with work release. *Edwards*, 908 F.2d at 302. The Arkansas' work/study release program, in which prisoner participants could live and work outside an institutional facility under the close supervision of a parole officer, was more like parole and therefore created a liberty interest arising from the Due Process Clause.

> Certainly Edwards is subject to more constraints in the . . . program than she would be if on parole, but we find determinative the fact that she has been released from institutional life into society. The constraints applied to Edwards serve to guide her in the outside world, not . . . to confine her to the equivalent of an institutional life.

*Edwards*, 908 F.2d at 302-03.

However, work release programs which require inmates to return daily to correctional institutions do not create a liberty interest inherent in the Due Process Clause. *Id.* at 301-02 (citing *Brennan v. Cunningham*, 813 F.2d 1 (1st Cir. 1987); *Hake v. Gunter*, 824 F.2d 610 (8th Cir. 1987); *Whitehorn v. Harrelson*, 758 F.2d 1416 (11th Cir. 1985)).

CRC is closer to work release than parole. CRC is not a release from institutional life, but an extension of it. Section 301.046, STATS., establishes the community residential confinement program as a correctional institution within the Department of Corrections.[14] DOC "confine[s] prisoners in their places of residence or other places designated by the department." Section 301.046(1). CRC participants are "prisoners" and "inmates." Section 301.046; WIS. ADM. CODE § DOC 327. CRC inmates must "wear an electronic device continuously on the inmate's person." WIS. ADM. CODE § DOC 327.09(1)(q). They are subject to all DOC disciplinary codes as modified by WIS. ADM. CODE § DO C 327.09(2) and remain in the legal custody of, and in institutional status with, the Department of Corrections. Section 301.046(2); WIS. ADM. CODE § DOC

---

[14] Section 301.046, STATS., provides in relevant part:

(1) The department shall establish and operate a community residential confinement program as a correctional institution under the charge of a superintendent. Under the program, the department shall confine prisoners in their places of residence or other places designated by the department. . . .

(2) Inmates confined under sub. (1) are under the care and control of the institution, subject to its rules and discipline and subject to all laws pertaining to inmates of other correctional institutions. . . .

. . . .

(5) The department shall monitor any prisoner's confinement under sub. (1) by the use of an electronic device worn continuously on the prisoner's person or by the confinement of the prisoner in supervised places designated by the department. The department may permit the prisoner to leave confinement for employment, education or other rehabilitative activities.

(6) Any intentional failure of a prisoner to remain within the extended limits of his or her confinement or to return within the time prescribed by the superintendent is considered an escape under s. 946.42(3)(a).

327.07(5). After thirty days in CRC placement, an inmate may participate in leisure time activities but only with prior approval of a CRC staff member. WIS. ADM. CODE § DOC 327.16(5). Special conditions may be placed on the inmate's mail, visits and telephone calls. WIS. ADM. CODE § DOC 327.16(7). The CRC inmate's residence may be searched at any time. WIS. ADM. CODE § DOC 327.21(1). The Department of Corrections continues to provide the inmate on CRC assignment with medical care if the inmate does not have private health insurance. WIS. ADM. CODE § DOC 327.16(3).

Even if a CRC inmate resides in his home, he is confined. He remains electronically monitored as if he were behind bars and fences and within "the immediate authority of guards or wardens." *Harper*, 64 F.3d at 566. He can be charged with escape should he leave without permission. Section 301.046(6), STATS.

■ Because Santiago had no liberty interest in his CR C status, he cannot recover under § 1983 for loss of that status and the resulting return to WCA.

B. Waiver of Due Process Claims

The State contends that because in his administrative appeal to Danner from Zangl's decision, Santiago did not claim his procedural due process rights were violated at the disciplinary hearing, the trial court should have granted summary judgment dismissing his due process claim on those errors against Zangl and Danner. We agree.[15]

---

[15] The State also argues defendants' actions were random and unauthorized and postdeprivation remedies were adequate, defendants were entitled to qualified immunity, and the trial court's finding that Santiago objected at the disciplinary

Our discussion is relevant at this point only to Santiago's liberty interest in not having his mandatory release date extended.

Whether summary judgment should have been granted is a question of law we decide without deference to the trial court's decision. *Lentz v. Young*, 195 Wis. 2d 457, 468, 536 N.W.2d 451, 455 (Ct. App. 1995). Summary judgment procedure is used to determine whether a genuine issue of material fact exists and must be tried. *Grams v. Boss*, 97 Wis. 2d 332, 338-39, 294 N.W.2d 473, 476-77 (1980), is one of the many cases describing summary judgment methodology. We need not repeat it. When, as here, the material facts are substantially undisputed, we forego the step-by-step analysis that methodology requires.

Citing *Felder v. Casey*, 487 U.S. 131 (1988),[16] the trial court held that a state court may not require a complainant to exhaust state administrative remedies before bringing a § 1983 action unless the complainant falls under an exception to the exhaustion of administrative remedies rule. Since no exception applied, the court concluded Santiago had not waived his 42 U.S.C. § 1983 claim by failing to claim in his

---

hearing to the denial of his due process rights was clearly erroneous. Because we conclude Santiago waived his procedural due process claims (other than his sufficiency of the evidence claim) on administrative appeal, we do not reach these issues.

[16] "In *Felder v. Casey*, we . . . held that a Wisconsin notice-of-claim statute that effectively shortened the statute of limitations and imposed an exhaustion requirement on claims against public agencies and employees was pre-empted insofar as it was applied to § 1983 actions." *Howlett v. Rose*, 496 U.S. 356, 377 (1990).

administrative appeal that his due process rights had been violated.

The doctrines of waiver and exhaustion are distinct in their application to § 1983 actions brought by inmates. An inmate cannot be required to exhaust his administrative remedies,[17] but the inmate can waive his claim under § 1983 when he pursues his administrative remedies without seeking review of errors he later claims had violated his due process rights.

■

A prisoner waives his due process rights by failing to object when those rights are denied at an inmate disciplinary hearing. *Saenz v. Murphy*, 162 Wis. 2d 54, 57, 469 N.W.2d 611, 612 (1991). The waiver entitles prison officials alleged to have denied those rights to summary judgment. *Id.* at 67, 469 N.W.2d at 617. The waiver is effective even if it was not voluntary and intelligent. *Id.* at 64, 469 N.W.2d at 616.

The *Saenz* court distinguished between the doctrines of waiver and exhaustion of remedies, but noted they had the same policy underpinnings. The court said requiring parties to raise issues before the

---

[17] The federal Civil Rights of Institutionalized Persons Act of 1980 (CRIPA) required adult prisoners to exhaust state administrative remedies if the remedies provided by the state comply with federal standards. *Casteel v. Vaade*, 167 Wis. 2d 1, 5, 481 N.W.2d 476, 477 (1992). Wisconsin's Inmate Complaint Review System did not comply with these federal standards. *Id.*

The Prison Litigation Reform Act, enacted April 26, 1996, requires exhaustion of administrative remedies regardless whether those remedies have been certified. Pub. L. No. 104-134, § 803 (1996). Because of our disposition, we have not asked the parties to brief whether the Prison Litigation Reform Act should be applied to pending § 1983 appeals.

trier of fact assists the administration of justice by avoiding wasteful proceedings on appeal and remand to resolve matters that could have been resolved in previous proceedings. *Id.* at 66, 469 N.W.2d at 616-17. Those same reasons "motivated courts to require inmates to exhaust their administrative remedies." *Id.* at 66, 469 N.W.2d at 616. "If Saenz can be required to exhaust his administrative remedies before bringing a § 1983 action, he can be required to object to an alleged violation of his due process rights before the adjustment committee." *Id.* at 66, 469 N.W.2d at 617.

One year later, our state high court held that a prisoner need not exhaust his administrative remedies before bringing a § 1983 action in state court. *Casteel v. Vaade*, 167 Wis. 2d 1, 5, 481 N.W.2d 476, 477 (1992). The court "disavow[ed] any intimation in *Saenz v. Murphy* that prison inmates must exhaust their administrative remedies before they may commence a sec. 1983 action." *Casteel*, 167 Wis. 2d at 21 n.18, 481 N.W.2d at 484 (citations omitted). The *Casteel* court addressed only *Saenz*'s discussion of the exhaustion doctrine and not the *Saenz* waiver doctrine.

While *Saenz* reviewed errors at a disciplinary hearing, we apply without hesitation its waiver doctrine to administrative appeals in the prison setting. A state need not give its prisoners a right of administrative appeal from disciplinary decisions. *Cf. Wolff*, 418 U.S. at 563-70 (inmates must receive advance written notice of alleged violations and a written statement of the facts found, the evidence relied upon, and the reasons for the disciplinary action, and they should be allowed to call witnesses and present documentary evidence and to have the assistance of other inmates or a staff advocate). Thus,

Wisconsin affords prisoners more process than the Fourteenth Amendment requires.[18] The procedure for major violation hearings includes the right of administrative appeal. WIS. ADM. CODE § DOC 303.76. In that sense, an administrative appeal is an extension of the disciplinary hearing process.

Santiago's administrative appeal from hearing officer Zangl's decision to Danner did not claim procedural due process defects except that (liberally construed) it claimed that insufficient evidence supported the findings of guilt. Santiago's administrative appeal, if successful, could have corrected the claimed errors in the same process which he now contends denied him due process. We conclude he has waived his right to pursue a § 1983 claim on the errors he did not raise in his administrative appeal before Danner.[19]

Santiago argues that the *Saenz* waiver doctrine is inapposite because Danner had an independent obligation to review the hearing record regardless of whether Santiago raised the due process issue in his administrative appeal. We disagree. In *Saenz*, the prisoner claimed he had been denied his right to call a witness. The court recognized that the state has the burden in prison disciplinary proceedings "to produce at the prisoner's disciplinary hearing the witnesses

---

[18] The administrative appeals from inmate disciplinary proceedings have various purposes, including increasing uniformity in decision-making, eliminating or reducing abuses of discretion and providing an opportunity for the institution's superintendent to review the work of subordinates. WIS. ADM. CODE § DOC 303.76(7), Appendix.

[19] To paraphrase Chief Justice Rehnquist, they who invoke must not waive. *City of Columbus v. Leonard*, 443 U.S. 905 (1979) (Rehnquist, J., dissenting).

requested by the prisoner or their signed, written statements." *Id.* at 64, 469 N.W.2d at 615. Although the record failed to disclose whether the State had met that duty, the *Saenz* court ruled: "[A]ny error committed by the state was waived by Saenz when he walked out of the disciplinary hearing without objecting to the absence of Dr. Strangmen or his signed, written statement." *Id.* at 64, 469 N.W.2d at 616.

Consequently, notwithstanding Danner's duty to review the disciplinary hearing record for error, because Santiago did not raise denial of his procedural due process rights in his administrative appeal, he waived the right to pursue a due process claim against Zangl and Danner based on those denials. Assuming that Ware's improperly classifying the charged offenses denied Santiago due process, our waiver analysis as to his claims against Zangl and Danner also applies to his claim against Ware.

C. Sufficiency of the Evidence

Santiago argues that Zangl and Danner violated his right to substantive due process because they lacked sufficient and reliable evidence when they found he violated WIS. ADM. CODE § DOC 303.63, institutional policies and procedures, and WIS. ADM. CODE § DOC 303.28, disruptive conduct. The state asserts that the conduct report and Santiago's own statement provided sufficient evidence to support those findings.

1. "Some Evidence" Test

"Some evidence" must exist in order to support a finding of guilt in a prison disciplinary hearing.

*Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Under the "some evidence" standard, the question is whether *any* evidence exists in the record that could support the conclusion and resultant disciplinary action against the prisoner. *Id.* at 455-56. If "some evidence" exists, that is sufficient evidence to satisfy due process. If no evidence exists, a finding of guilt violates due process.

In *Hill*, the evidence before the disciplinary board consisted of first-person testimony from a prison guard and copies of his written report. The guard testified he heard a commotion in a prison walkway and upon investigating, he discovered an inmate lying on the ground, bleeding from the mouth and with a swollen eye. The guard saw three inmates running from the scene, but the victim denied they were the persons who had assaulted him. Nonetheless, the three inmates were charged and disciplined for assault. *Id.* at 447-48.

While acknowledging both the absence of any direct evidence and the existence of contrary testimony, the Supreme Court held the record contained "some evidence" that could support the decision by the board to revoke good time credits for one of the three fleeing inmates. *Id.* at 456. The *Hill* Court did not weigh the admittedly "meager" evidence. It sought only to ensure that the record was not "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Id.* at 457.

WISCONSIN ADM. CODE § DOC 303.63 provides that "[v]iolations of any specific policies or procedures authorized" by the institution "are offenses." The record before Zangl and Danner contained no evidence

of those policies or procedures. The evidence supporting the § DOC 303.63 charge was insufficient.[20]

WISCONSIN ADM. CODE § DOC 303.28 states, "Any inmate who intentionally . . . engages in, causes or provokes disruptive conduct is guilty" of disruptive conduct. "Disruptive conduct" is defined in part as "overt behavior which is unusually loud . . . and may include arguments . . . or loud talking, which may annoy another."

Relying on *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987), Santiago asserts he was convicted upon unreliable evidence. The *Cato* court explained that the information relied upon by the disciplinary board must bear "some indicia of reliability," and it held that a confidential informant's second-hand report was insufficiently reliable. *Id.* The only evidence offered in support of Santiago's guilt, he argues, was the information contained in the conduct report, which he equates with the confidential informant's statement in *Cato*. The trial court agreed with Santiago's assessment of the record.[21] We do not.

At the hearing, Santiago also made a statement which Zangl transcribed. Whether that statement contains some evidence that Santiago was guilty of disruptive conduct is a question of law which we decide without deference to the trial court's decision. That statement provides in relevant part:

---

[20] Santiago was found not guilty of violating WIS. ADM. CODE § DOC 303.63 upon the rehearing by Benzer for this very reason. The trial court found that as a result of this conviction months earlier, Santiago lost his CRC status.

[21] The trial court concluded there was *no* reliable evidence of Santiago's guilt because Zangl and Danner based their findings on the uncorroborated and unreliable hearsay evidence in the conduct report.

I had to get the R.N., Diana Brown to get my lock open. I have no use in my hands. I went out of my room to have her open my lock and to have her put my stuff away because I was anticipating going to the festival on the 19th of June. It was thereby coincidence that I had the opportunity to see the cook. . . . I tried to explain to him of the grievances [about the food] and we have to find a solution. Him, not understanding me, misinterpreted, or thought I was mental. He made it known to me that I was nothing but a motherfucker and that I should stay in my wheelchair and go to my room because he knows nothing about some such counsel. [?] That's when I stood by the counter and explained to him that in the morning or when he comes in that he and his supervisor and the president and I should sit down and iron this out before it gets out of proportion. I noticed hostility between both of us. That's when the aide, my aide put my lock on my chair and grabbed my hand and said, Jaime, forget it, wait till the morning and we'll straighten this out. The lock was on my chair. He grabbed the lock and my hand and that's when the lock came into play. The man was never threatened. . . . The yelling was an interpretation of every individual. He didn't understand me and I had to repeat at least three times the issue itself. That's when he did push me over the counter and said sit down, mental defect. . . . I did call the police because I felt point blank that his friends and he were going to try something.

Santiago's first-hand statement meets the *Hill* "some evidence" test. He acknowledged "yelling" and "hostility between" him and the cook. We therefore need not determine whether the conduct report evidence was reliable.

330

We conclude Zangl and Danner violated Santiago's due process rights because no evidence existed to find Santiago guilty of violating WIS. ADM. CODE § DOC 303.63, Institutional Policies and Procedures. However, sufficient evidence existed in Santiago's written statement from which the defendants could find he violated WIS. ADM. CODE § DOC 303.28, Disruptive Conduct.

### 2. Procedural or Substantive Due Process

WISCONSIN ADM. CODE § DOC 303.76(6) provides that an inmate in a disciplinary hearing must be found guilty by a preponderance of evidence. The state argues that if Zangl or Danner found Santiago guilty of charges without a preponderance of evidence, their conduct violated § DOC 303.76(6), and was therefore random and unauthorized.

The random and unauthorized conduct defense applies only to procedural due process claims.[22] The parties dispute whether a violation of the *Hill* "some evidence" standard is a procedural or a substantive due process violation.

"The Fourteenth Amendment contains only one Due Process Clause. Though it is sometimes helpful, as a matter of doctrine, to distinguish between substantive and procedural due process . . . the two concepts are not mutually exclusive, and their

---

[22] SHELDON H. NAHMOD, CIVIL RIGHTS AND CIVIL LIBERTIES LITIGATION, THE LAW OF SECTION 1983 § 3.09, at 176 n.17 (3d ed. 1991) ("*Parratt* only applies in procedural due process cases where the plaintiff challenges the absence of a hearing; it does not and should not apply where the plaintiff challenges the defendant's conduct irrespective of a hearing. That is, *Parratt* does not apply to substantive due process.").

protections often overlap." *Albright v. Oliver*, 510 U.S. 266, 301 (1994) (Stevens, J., dissenting). Indeed, legal commentators differ over whether the "some evidence" standard is procedural or substantive.[23] *See* Richard H. Fallon Jr., *Some Confusions About Due Process, Judicial Review, and Constitutional Remedies*, 93 COLUM. L. REV. 309, 364 (1993) (The *Hill* Court "suggested that a reviewing court should hold a decision to deprive a prisoner of good time credits substantively arbitrary only if there were no evidence to support it."); Gerald L. Neuman, *The Constitutional Requirement of 'Some Evidence,'* 25 SAN DIEGO L. REV. 631, 670 (1988) ("[T]he 'some evidence' standard makes sense as a procedural due process doctrine relating to issues narrower than total substantive rationality.").

The *Hill* Court held "that revocation of good time does not comport with 'the minimum requirements of procedural due process' unless the findings of the prison disciplinary board are supported by some evidence in the record." *Hill*, 472 U.S. at 454 (citation omitted). The "some evidence" standard grew directly from the procedural requirement established in *Wolff v. McDonnell*, 418 U.S. 539 (1974), that a prisoner must receive a written statement by the fact-finder of the evidence relied on and the reasons for any disciplinary action. *Hill*, 472 U.S. at 454. While acknowledging that prisoners have circumscribed constitutional rights, the

---

[23] The protections of substantive due process have for the most part been accorded to "fundamental rights" generally found in the areas of marriage, family, procreation and the right to bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Substantive due process also bars government conduct that "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted).

*Wolff* Court enumerated minimum *procedural* safeguards necessary to ensure fairness in prison disciplinary proceedings. *Wolff*, 418 U.S. at 539. In *Wolff*, the Court did not, however, specify the quantum of evidence necessary to support the fact-finder's decision. *Hill* solved this ambiguity with the "some evidence" standard.

Santiago contends the seventh circuit has construed *Hill* to mean that the "some evidence" standard is a "substantive requirement" to protect the procedural due process rights established in *Wolff*. He cites *Aikens v. Lash*, 514 F.2d 55, 60 (7th Cir. 1975), *rev'd on other grounds*, 425 U.S. 947 (1976); *Culbert v. Young*, 834 F.2d 624, 630 (7th Cir. 1987), *cert. denied*, 485 U.S. 990 (1988); and *Chavis v. Rowe*, 643 F.2d 1281, 1287 (7th Cir. 1981), *cert. denied*, 454 U.S. 907 (1981). In *Aikens*, the court stated an inmate had a "substantive due process right not to be found guilty except by an appropriate quantum of evidence," but *Aikens* was decided a decade before *Hill. Aikens*, 514 F.2d at 60. *Chavis* restates *Aikens* and also precedes *Hill. Chavis*, 643 F.2d at 1287. The *Culbert* court referenced the "substantive standards set forth in *Hill*," but questioned whether *Hill* had lowered the quantum of evidence required by the *Aikens* court to sustain a prison disciplinary decision. *Culbert*, 834 F.2d at 630.

No published opinion in the seventh circuit has specifically held that the *Hill* "some evidence" standard is procedural or substantive. A majority of the circuits have applied the "some evidence" standard as a procedural due process requirement.[24]

___

[24] *See, e.g., McGuinness v. Dubois*, 75 F.3d 794, 800 (1st Cir. 1996) (*Hill* holds "that procedural due process is satisfied if the decision . . . is supported by 'some evidence' in the record.");

Santiago argues that because "some evidence" helps protect an inmate from being arbitrarily found guilty, his substantive due process rights are implicated. We disagree. Procedural due process itself protects against arbitrary deprivations. When discussing procedural due process in prison disciplinary proceedings, the *Wolff* Court declared "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558 (citing *Dent v. West Virginia*, 129 U.S. 114 (1899)).

Neuman suggests that the purpose of the "some evidence" standard is to ensure the constitutional fairness of the hearing, rather than the constitutional

---

*Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("*Hill* . . . only concerned *procedural* due process . . . . The issue in *Hill* was merely whether there was, and whether there needed to be, some evidence to support a prison disciplinary decision." (emphasis in original)); *Mitchell v. Maynard*, 80 F.3d 1433, 1445 (10th Cir. 1996) ("If there is some evidence . . . then the requirements of procedural due process have been met."); *Williams v. Fountain*, 77 F.3d 372, 375 (11th Cir. 1996) (If there was "a sufficient evidentiary basis . . . then procedural due process concerns would be allayed."). *See also Hudson v. Edmonson*, 848 F.2d 682, 688 (6th Cir. 1988) (quoting and applying *Hill's* holding, "revocation . . . does not comport with 'the minimum requirements of procedural due process,' unless the findings . . . are supported by some evidence in the record."); *Toussaint v. McCarthy*, 801 F.2d 1080, 1104 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069 (1987); *Brown v. Frey*, 807 F.2d 1407 (8th Cir. 1986) (affirming district court's conclusion that inmate had been afforded procedural due process because prison disciplinary decision was supported by "some evidence"). No circuit, including the seventh, has interpreted *Hill* as raising a substantive due process issue.

sufficiency of evidence regardless of the fairness of that hearing.[25]

> [T]he requirement is procedural, and protects the individual's right to an impartial and conscientious decision on the merits, based on the evidence of record. . . . *A decision is not supported by "some evidence" when the discrepancy between the findings on which it rests and the evidence of record is so great as to indicate clearly that the findings were not in fact derived impartially from the record.* . . . Requiring "some evidence" guards against hearings that are not truly meaningful because the decisionmaker vitiates the individual's for input . . . .

Neuman, *supra*, at 678 (emphasis in original).

Citing *United States ex rel. Tisi v. Tod*, 264 U.S. 131, 133-34 (1924), the *Hill* court said, "[T]he relevant question is whether there is any evidence in the record that could support the conclusion." *Hill*, 472 U.S. at 455-56. *Hill*'s citation of *Tisi* supports Neuman's analysis. The *Tisi* Court's review of the evidence sought to ensure the fairness of the administrative hearing.

---

[25] If the "some evidence" standard required that administrative decisions implicating liberty interests have "an acceptably reasoned basis (or more) for every adjudicative decision," the strain on judicial resources would be "extraordinarily ambitious." Gerald L. Neuman, *The Constitutional Requirement of 'Some Evidence,'* 25 SAN DIEGO L. REV. 631, 669 (1988). Every challenged case would "require independent scrutiny of the record to make sure that a 'rational' decisionmaker could have reached the challenged decision on the evidence presented, in light of the apparently applicable substantive law and the legal burden of proof." *Id.*

> The denial of a fair hearing is not established by proving merely that the decision was wrong. This is equally true whether the error consists in deciding wrongly that evidence introduced constituted legal evidence of the fact or in drawing a wrong inference from the evidence. The error of an administrative tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one.

*Tisi*, 264 U.S. at 133.

■

We conclude that the "some evidence" standard is a procedural due process standard. The question is whether Zangl's and Danner's findings that Santiago violated WIS. ADM. CODE§ DOC 303.76(6), Institution Policies, were "random and unauthorized."

3. Random and Unauthorized Acts

■

Generally, due process requires notice and an opportunity to be heard before a deprivation of life, liberty or property. *Irby v. Macht*, 184 Wis. 2d 831, 843, 522 N.W.2d 9, 13, *cert. denied*, 115 S. Ct. 590 (1994). When a deprivation of a liberty interest results from the "random and unauthorized" acts of state employees, "providing meaningful predeprivation process is impracticable." *Id.* at 843, 522 N.W.2d at 14 (citing *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981)); *Zinermon v. Burch*, 494 U.S. 113, 128-29 (1990). Because the state cannot predict when such acts will occur, due process will be satisfied if the state provides adequate postdeprivation remedies. *Irby*, 184 Wis. 2d at 843, 522 N.W.2d at 14 (citing *Parratt*, 451 U.S. at 544).

Irby alleged that state prison employees violated ch. 303 of the Department of Corrections' disciplinary code by failing to give him prior notice of the disciplinary hearing, providing him the reasons for its decision, allowing him to call witnesses, and assigning a staff advocate free of conflict of interest. *Irby*, 184 Wis. 2d at 846, 522 N.W.2d at 15. The *Irby* court concluded that the defendants lacked "authority to deprive Irby of any of these procedural rights," and their conduct was therefore "random and unauthorized." *Id.* at 846-47, 522 N.W.2d at 15.

We agree with the state that Zangl and Danner each had a duty to meet the preponderance of the evidence standard before finding Santiago guilty. WIS. ADM. CODE § DOC 303.76(6).[26] Their conduct violating that duty was random and unauthorized.

Hence, the question is whether adequate postdeprivation remedies were available to Santiago. As a result of Zangl's and Danner's unauthorized conduct, Santiago received a ten-day extension of his mandatory release date and a referral to the program review committee which resulted in termination of CR C status. Santiago failed to seek judicial relief by way of certiorari. Instead, he proceeded directly to the § 1983 and negligence action before us.

The *Irby* court held that certiorari review provided an adequate remedy for Irby's loss of earned good time because the circuit court can order restoration of any lost good time and can expunge the prisoner's disciplinary record. *Id.* at 847, 522 N.W.2d at 15. We

---

[26] Santiago does not dispute that meeting the "preponderance of the evidence" standard would comply with the "some evidence" requirement.

see no reason why certiorari would not be equally available to remedy the wrongful ten-day extension of Santiago's mandatory release date. As in *Irby*, expungement could be ordered by a certiorari court.[27]

## IV.

## STATE CLAIMS

Public employees are immune from personal liability for injuries resulting from the negligent performance of a discretionary act within the scope of they individual's public office. *C.L. v. Olson*, 143 Wis. 2d 701, 710, 422 N.W.2d 614, 617 (1988). A discretionary act is one that involves choice or judgment. *Kimps v. Hill*, 200 Wis. 2d 1, 23-24, 546 N.W.2d 151, 161 (1996) (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).

An exception to immunity exists for ministerial acts. *Kimps v. Hill*, 187 Wis. 2d 508, 513, 523 N.W.2d 281, 284 (Ct. App. 1994), *aff'd*, 200 Wis. 2d 1, 546 N.W.2d 151 (1996). A public employee's duty is ministerial "only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister v. Board of Regents*, 72 Wis. 2d 282, 301, 240 N.W.2d 610, 622 (1976). Whether a duty is ministerial is a question of law which we review

---

[27] Having disposed of the issues on other grounds, we do not decide whether the rehearing held in February 1993 before Danner was a complete cure for any constitutional deprivation that occurred during the first hearing.

338

without deference to the trial court. *Larsen v. Wisconsin Power & Light Co.*, 120 Wis. 2d 508, 516, 355 N.W.2d 557, 562 (Ct. App. 1984). The state does not challenge the court's findings that the defendants negligently performed their duties.

We turn first to Ware's claimed immunity.[28] Santiago acknowledges that a decision to classify an offense as major or minor involves choice "in some cases," and is therefore discretionary. He argues, however, that Ware had a ministerial duty to look first at the list of offenses automatically classified as major under WIS. ADM. CODE § DOC 303.68(3) to see if it included the offenses charged against Santiago. Citing *Lister v. Board of Regents*, Santiago contends the automatic major provision limits choice and imposes a duty with such certainty that nothing remains for judgment or discretion.

In *Lister*, University of Wisconsin law students sued a university official, alleging he had negligently performed a ministerial duty of determining their residency status. *Lister*, 72 Wis. 2d at 288-89, 240 N.W.2d at 616. The court reviewed the official's duties under the relevant statutes.

> Section 36.16(1)(a) provided that "a bona fide resident of the state for one year next preceding the beginning of any semester for which such student registers at the university . . . shall while he continues a resident of the state be entitled to exemption from nonresident tuition." Under

---

[28] Prior to trial, the court granted Ware summary judgment on Santiago's negligence claim on the ground that she had discretionary immunity. In its statement of the case, the State says this decision was reconsidered. We have been unable to locate such a reconsideration.

§ 36.16(3), in determining bona fide residence, several activities of the student "shall be considered." However, a student from another state who was in this state "principally to obtain an education" was not to be considered to have established a residence in Wisconsin by virtue of attendance at educational institutions.

*Id.* at 301, 240 N.W.2d at 622. The court held, "The statute did not prescribe the classification *process* with such certainty that nothing remained for the administrative officer's judgment and discretion." *Id.* (emphasis added).

Like the official in *Lister,* Ware engaged in a classification process. Ware exercised judgment in selecting and applying the relevant provisions of the administrative code to the facts presented. We reject Santiago's portrayal of the automatic classification as a threshold ministerial decision required for the later exercise of choice or judgment to determine if a non-automatic offense is major or minor. The classification determination is itself the *result* of choice and judgment, not a prerequisite.

The administrative code establishes a process for the classifying prison offenses as major or minor. Ware first had to review the appropriateness of the charges. WIS. ADM. CODE § DOC 303.67(3). For a minor offense, she could have dismissed the conduct report if the inmate was either unfamiliar with the rule, had not violated recently the same or a closely related rule, was unlikely to repeat the offense if warned or counseled, or the purposes of the prison disciplinary code would not be furthered by writing a conduct report. WIS. ADM. CODE §§ DOC 303.67(3)(a) and 303.65. Ware had to strike offenses not supported by the facts alleged, or

340

could add offenses supported by the facts. WIS. ADM. CODE § DOC 303.67(3)(b)-(c). She could refer the conduct report for further investigation. WIS. ADM. CODE § DOC 303.67(3)(e). After completing this review, involving judgment and choice, Ware then was required to "divide all remaining conduct reports into major and minor offenses." WIS. ADM. CODE § DOC 303.67(4).

That Ware may have been required to exercise her judgment, or that she may have done so wrongly, does not transform her exercise of judgment into a ministerial act. *See Lister*, 72 Wis. 2d at 302, 240 N.W.2d at 622. Ware's exercise of judgment was an act of discretion.

Santiago argues that both Zangl and Danner had a non-discretionary duty to look at the waiver form to see if there had been a proper waiver.[29] An evaluation of Santiago's waiver form required analysis and judgment. The box indicating Santiago waived his right to a formal due process hearing had been checked, then crossed out. Interpreting the resulting composite mark required judgment. Moreover, as Santiago states in his recitation of facts, "[Zangl] did not ask Santiago about the incomplete waiver form, or whether he intended to waive his right to a formal due process hearing. There is no rule or regulation requiring hearing officers to verify that an inmate has waived his due process rights before holding a waiver hearing." Thus, it can hardly be said that the law imposed a duty

---

[29] Santiago does not argue that Zangl had a non-discretionary duty to stop the waiver hearing even if, as the trial court found, Santiago voiced his objections to Zangl and requested a due process hearing. The State challenges that finding as clearly erroneous. We need not reach that issue.

upon Zangl that was "absolute, certain and imperative."

As to Danner, we again reject Santiago's attempt to isolate the evaluation of his waiver form from Danner's responsibilities as appeal officer. WISCONSIN ADM. CODE § DOC 303.76(7)(b) requires appeal officers to "review all records and forms pertaining to the appeal and make his or her decision within 10 days following receipt of the request." A review of the entire record on appeal involves judgment. As with Ware, that Danner may have been required to exercise judgment or that he did so wrongly does not transform his duties from discretionary to ministerial.

We conclude Ware, Zangl and Danner enjoy discretionary immunity from Santiago's negligence claims against them.

## V.

## CONCLUSION

Santiago's complaint should be dismissed in its entirety. Santiago had a liberty interest in not having his mandatory release date extended, but he had no liberty interest in remaining in the community residential confinement program. He waived all procedural due process objections to the extension of his release date except for the insufficiency of the evidence. When defendants Zangl and Danner found Santiago guilty of violating institutional policies and procedures, without supporting evidence, their acts were random and unauthorized. However, Santiago failed to pursue certiorari, an adequate judicial remedy for the damage he suffered from those acts. Defendants

Ware, Zangl and Danner enjoy discretionary immunity from Santiago's state law negligence claim.

We therefore reverse the judgment before us and direct that the complaint be dismissed.

*By the Court.*—Judgment reversed and cause remanded with directions.

SUNDBY, J. *(concurring)*. I concur in our mandate but not in the majority opinion.

Procedural due process requires adequate notice and an opportunity to be heard when the State proposes to take away a person's property or liberty. The State proposed to discipline Santiago for conduct violating prison regulations. The hearing officer, Todd Zangl, did not give Santiago a full due process hearing, which Santiago requested. However, the Sector Superintendent, Dennis A. Danner, recognized Zangl's error and ordered Daniel Benzer, a social services supervisor for the Division of Intensive Sanctions, to give Santiago a rehearing. Benzer gave Santiago a full due process hearing and found him not guilty of violating WCI's policies and practices, but guilty of disruptive conduct. Danner assigned Santiago an advocate who was allowed to call witnesses on Santiago's behalf and to present a defense.

Let's pause a moment to consider whose action the circuit court would have reviewed had Santiago pursued his certiorari remedy; not Zangl's, because whatever action he took was mooted when the conduct report was reheard. The court would have reviewed Benzer's finding that Santiago was guilty of disruptive conduct. How then is Zangl's and Danner's denial of Santiago's right to procedural due process implicated? There is no cause of action for an aborted denial of

procedural due process as long as the mistake is corrected before there is a loss of liberty. We are not presented here with a deprivation of a liberty interest which was final, subject to correction by judicial action; here, the deprivation did not occur until after Santiago had been given all the process due him. I recognize that some federal circuits award damages for emotional distress caused by denial of procedural due process, *see Laje v. Thomason Gen. Hosp.*, 665 F.2d 724, 728 (5th Cir. 1982). However, in those cases the liberty interest was lost only after failure to provide procedural due process.

Zangl may have denied Santiago adequate notice and an opportunity to be heard; Danner may have compounded Zangl's error but nothing came of it. Santiago did not lose a liberty interest because of their acts because someone in the Division had the good sense to realize the potential liability and order the institution to proceed properly. The real issue on this appeal is whether the initial denial of notice and an opportunity to be heard may be corrected without liability. The answer on that score has got to be "yes." If not, every procedural mistake becomes a constitutional violation complete when the mistake is made. It is fundamental, however, that denial of procedural due process is not complete unless and until the person affected loses a protected property or liberty interest. Santiago did not lose a liberty interest until after the conduct hearing before Benzer where he had adequate notice of the charges against him and a fair opportunity to defend against those charges.

Santiago argues that he was denied substantive as well as procedural due process. Substantive due process is the right to be protected against arbitrary and wrongful government action regardless of the

fairness of the procedures government uses to take the arbitrary action. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Santiago asserts that defendants deprived him of his liberty without even a "modicum" of evidence. *See Superintendent v. Hill*, 472 U.S. 445, 455 (1985). Santiago's claim is premature; until he has lost his liberty because of arbitrary and capricious governmental action he has not suffered a substantive due process deprivation. He has the right to appeal his potential loss of liberty by certiorari; the disciplinary action to which he may be subject may be set aside precisely because the evidence is insufficient. If the reviewing courts affirm Santiago's loss of liberty, he may then pursue his remedy under 42 U.S.C. § 1983. The Civil Rights Act of 1871 created a federal tort because the freed slaves and Union sympathizers could not obtain relief in state courts. If Santiago's loss of liberty is affirmed by the Wisconsin courts, the federal courts are available to him to correct the constitutional wrong. However, the Wisconsin courts have not had an opportunity to review Santiago's conviction for violating prison regulations. Until that opportunity proves fruitless, Santiago has not lost his liberty because of arbitrary and capricious governmental action.

I therefore conclude that Santiago has not stated a claim under § 1983. For the same reasons, Santiago does not have a claim under state law. He simply has not been injured until his conviction and punishment have been affirmed. Conceivably, Santiago could state a claim if he alleged a conspiracy between the defendants to "frame" him and he could show that the charges against him were pretextual, masking an intent to prosecute him maliciously. I do not believe the

facts alleged in Santiago's complaint and proof support such a claim.

For these reasons, I do not join in the majority opinion. The reasons assigned by the majority for reaching the same result I reach are unnecessary to our decision.